**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| MARY SHIRAEF; | ) | |
| | ) | |
| JANE DOE 1; | ) | |
| | ) | |
| JANE DOE 2; | ) | |
| | ) | |
| JANE DOE 3; | ) | |
| | ) | Case No. _____ |
| and | ) | |
| | ) | |
| ALICIA BAKER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| ERIC HARGAN, in his official capacity as | ) | |
| Acting Secretary of Health and Human | ) | |
| Services; | ) | |
| | ) | |
| R. ALEXANDER ACOSTA, in his official | ) | |
| capacity as Secretary of Labor; | ) | |
| | ) | |
| STEVEN MNUCHIN, in his official capacity | ) | |
| as Secretary of the Treasury; | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES; | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| LABOR; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF THE | ) | |
| TREASURY, | ) | |

Defendants.

## INTRODUCTION

1.     The Patient Protection and Affordable Care Act ("ACA") guarantees that women

receive health insurance coverage for certain women's preventive health services, including all

1

methods of FDA-approved contraceptives, sterilization procedures, and related patient education and counseling, without cost sharing.  Yet on October 6, 2017, the Trump Administration issued two Interim Final Rules[1] that deny Plaintiffs and countless other women this statutorily-required contraceptive coverage.[2]  The Rules create a broad exemption from the contraceptive-coverage requirement to allow universities and any non-governmental employer, including nonprofits and for-profit businesses, to impose their personal religious and moral beliefs on female students, employees, and their dependents.  The exemptions harm Plaintiffs and other women by depriving them of insurance coverage to which they are entitled, leaving them to find and try to pay for contraception on their own.  Thus, the Rules reinstate the very barriers that the ACA's requirement for coverage of women's preventive services was designed to address.  They deter women from using the most appropriate method of contraception, and leave some women unable to obtain contraception altogether.

       2.       Contraception is critical to women's health and economic and social equality.  It is also critical to the health of women's families.  Because contraception enables women to decide if and when to have children and is also used to treat or manage a wide array of often severe medical conditions, access to contraception allows women to make decisions that affect a broad spectrum of issues:  their health, their education and livelihoods, and the health of their families.  By allowing employers and universities the ability to deny women access to

---

[1] These Rules were issued and went into effect on October 6, 2017 and were published in the Federal Register on October 13.  Religious Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act, 82 Fed. Reg. 47,792 (Oct. 13, 2017) ("Religious Exemption Rule"); Moral Exemptions and Accommodations for Coverage of Certain Preventative Services Under the Affordable Care Act, 82 Fed. Reg. 47,838 (Oct. 13, 2017) ("Moral Exemption Rule") (together the "Rules").

[2] This Complaint uses the term "women" and raises claims of sex discrimination because Plaintiffs are women and because the Rules target women.  The denial of reproductive health care and insurance coverage for that care also affects individuals who may not identify as women, including some gender nonconforming people and some transgender men.

2

contraceptive coverage, the Rules threaten women's health and strip women of their equal participation in society and the economy.

3.      Bypassing the legally-required notice and comment process, the Rules were promulgated to take effect immediately and nullify existing regulations that took over six years to implement and involved no less than six rounds of notice-and-comment rulemaking, including consideration of over 725,000 comments.

4.      The Rules and their issuance violate the Administrative Procedure Act, the Establishment Clause of the First Amendment to the U.S. Constitution, the Due Process Clause of the Fifth Amendment to the U.S. Constitution including equal protection guarantees and the right to liberty, and the ACA.

5.      The Rules put all Plaintiffs at grave risk of not receiving contraceptive coverage guaranteed by the ACA.

6.      For these reasons and others described below, Plaintiffs will be harmed by the Rules.  Therefore, this Court should vacate the Rules and enjoin Defendants from enforcing them.

## PARTIES

7.      Plaintiff Mary Shiraef is a student at the University of Notre Dame and lives in South Bend, Indiana.  Ms. Shiraef is a woman of childbearing age and currently uses a Mirena intrauterine device ("IUD") to prevent pregnancy and treat IBS.  She needs the insurance coverage to which she is entitled for contraceptive follow-up care, counseling, potential removal of her IUD, and insertion of another IUD.  Ms. Shiraef is enrolled in the student health plan and relies on the plan for all of her medical needs, including contraceptives.  She relies on health insurance coverage to ensure continuing access to affordable contraception.  Although the University objects to contraceptive coverage, Ms. Shiraef had contraceptive coverage through the accommodation process:  to comply with federal law, Aetna Student Health provided the

coverage to Ms. Shiraef.[3]  The University sued the federal government to challenge the ACA contraceptive-coverage requirement, demanding a full religious exemption from the requirement (*see University of Notre Dame v. Price*, No. 13-3853 (7th Cir.) (appeal dismissed on Oct. 18, 2017)).  The University already has announced its intention to take advantage of the Rules.  As a result, Ms. Shiraef risks not receiving the coverage without cost sharing to which she is entitled for contraceptive follow-up care, counseling, potential removal of her IUD, and insertion of another IUD.

8.     Plaintiff Jane Doe 1 is a student at the University of Notre Dame and lives in South Bend, Indiana.  She is a woman of childbearing age and currently uses the birth control pill to prevent pregnancy.  She is enrolled in the University's student health-insurance plan and relies on that plan for all her medical needs, including contraceptives.  She relies on health insurance coverage to ensure continuing access to affordable contraception.  Although the University objects to contraceptive coverage, Doe 1 had contraceptive coverage through the accommodation process:  to comply with federal law, Aetna Student Health provided the coverage to Doe 1.[4]  Through the accommodation process, Aetna has been covering the cost of her birth control pills.  The University sued the federal government to challenge the ACA contraceptive-coverage requirement, demanding a full religious exemption from the requirement (*see University of Notre Dame v. Price*, No. 13-3853 (7th Cir.) (appeal dismissed on Oct. 18, 2017)).  The University already has announced its intention to take advantage of the Rules.  As a result, Doe 1 risks not receiving the coverage without cost sharing to which she is entitled for her birth control pills, contraceptive follow-up care, counseling, or another contraceptive method.

---

[3] University of Notre Dame, University Health Services, Insurance FAQs, https://uhs.nd.edu/insurance-billing/insurance-faqs/.

[4] University of Notre Dame, University Health Services, Insurance FAQs, https://uhs.nd.edu/insurance-billing/insurance-faqs/.

9.      Plaintiff Jane Doe 2 is a student at the University of Notre Dame and lives in South Bend, Indiana.  She is a woman of childbearing age who is enrolled in the student health plan and relies on the plan for all of her medical needs, including contraceptives.  She relies on health insurance coverage to ensure continuing access to affordable contraception.  Although the University objects to contraceptive coverage, Doe 2 had contraceptive coverage through the accommodation process:  to comply with federal law, Aetna Student Health provided the coverage to Doe 2.[5]  The University sued the federal government to challenge the ACA contraceptive-coverage requirement, demanding a full religious exemption from the requirement (*see University of Notre Dame v. Price*, No. 13-3853 (7th Cir.) (appeal dismissed on Oct. 18, 2017)).  The University already has announced its intention to take advantage of the Rules.  As a result, Doe 2 risks not receiving the coverage without cost sharing to which she is entitled while she waits to litigate any challenge to the Rules.

10.      Plaintiff Jane Doe 3 is employed by a university in Illinois.  She is a woman of childbearing age who is enrolled in her university's employee health insurance plan and relies on that plan for all her medical needs including contraceptives.  Doe 3 currently uses an IUD to prevent pregnancy and needs the coverage to which she is entitled for contraceptive follow-up care, counseling, potential removal of her IUD, insertion of another IUD, or use of another contraceptive method.  Doe 3's university objects to providing contraceptive coverage.  Doe 3's university health plan is provided by Christian Brothers, a religiously-affiliated issuer that challenged the contraceptive-coverage requirement as applied to employers like Doe 3's university.  Religious Exemption Rule, 82 Fed. Reg. at 47,823.  Doe 3's university and health insurance plan are expected to take advantage of the Rules and deny contraceptive coverage.

---

[5] University of Notre Dame, University Health Services, Insurance FAQs, https://uhs.nd.edu/insurance-billing/insurance-faqs/.

Thus, Jane Doe 3 risks not receiving the coverage without cost sharing to which she is entitled for contraceptive follow-up care, counseling, potential removal of her IUD, insertion of another IUD, or use of another contraceptive method.

11.     The Doe Plaintiffs are proceeding under pseudonyms in this action to preserve their privacy and to avoid potential retaliation by their respective university or employer, or others.

12.     Plaintiff Alicia Baker of Indiana is a married woman of childbearing age who wants to wait several years before having children.  Ms. Baker currently uses an IUD to prevent pregnancy and needs the insurance coverage to which she is entitled for contraceptive follow-up care, counseling, potential removal of her IUD, and insertion of another IUD.  Ms. Baker, a graduate of seminary, does not oppose contraceptives or IUD use; rather, she holds the sincere religious belief, informed by her formal studies of evangelical doctrine, that a married couple's decision to use contraception is its own.  Ms. Baker is an employee of a church that does not oppose contraceptive coverage, including coverage of IUDs.  Ms. Baker, however, is enrolled in her employer-sponsored health-insurance plan, which is offered by GuideStone Financial Resources, an entity that opposes coverage of IUDs.  In fact, GuideStone is specifically named in the Rules as a plan issuer that opposes the ACA contraceptive-coverage requirement.  Religious Exemption Rule, 82 Fed. Reg. at 47,823.  Indeed, GuideStone sued the federal government challenging the requirement.  *Id.*  Based on its longstanding objections, GuideStone is expected to take advantage of the Rules by not covering all methods of contraception in its plans including the one that Ms. Baker's employer offers.  Accordingly, Ms. Baker risks not receiving the coverage without cost sharing to which she is entitled for contraceptive follow-up care, counseling, potential removal of her IUD, and insertion of another IUD.

13. Defendants are appointed officials of the Executive Branch of the United States who are responsible for issuing and enforcing the contraceptive-coverage requirement under the ACA and the Rules, and any amendments thereto.

14. Defendant Eric Hargan is the Acting Secretary of Health and Human Services and is sued in his official capacity. He is responsible for the operation and management of the U.S. Department of Health and Human Services ("HHS").

15. Defendant R. Alexander Acosta is the Secretary of Labor and is sued in his official capacity. He is responsible for the operation and management of the U.S. Department of Labor.

16. Defendant Steven Mnuchin is the Secretary of the Treasury and is sued in his official capacity. He is responsible for the operation and management of the U.S. Department of the Treasury.

17. Defendant HHS is an executive agency of the United States and promulgated the Rules at issue in this action.

18. Defendant Department of Labor is an executive agency of the United States and promulgated the Rules at issue in this action.

19. Defendant Department of Treasury is an executive agency of the United States and promulgated the Rules at issue in this action.

## JURISDICTION AND VENUE

20. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361, as this action arises under the Constitution and laws of the United States. This Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. § 702, and Fed. R. Civ. P. 65.

21.     Venue is proper in this district under 28 U.S.C. § 1391(e).  Defendants are United States agencies and officers sued in their official capacities, and a substantial part of the events, actions, or omissions giving rise to these claims are occurring in this judicial district.  Moreover, Mary Shiraef and Jane Does 1 and 2 reside in this judicial district.

## FACTUAL BACKGROUND

### The Importance of Contraception and Barriers to Care

22.     Regardless of their religious affiliation, 99% of women of reproductive age who have had sexual intercourse report using at least one form of contraception at some point in their lives.  K. Daniels, W.D. Mosher & J. Jones, *Contraceptive Methods Women Have Ever Used: United States, 1982–2010*, National Health Statistics Reports, 2013, No. 62.

23.     Contraception is critical to women's and children's health.  Research also has shown that access to contraception improves the social and economic status of women.

24.     Contraception reduces unintended pregnancies, the need for abortion, adverse pregnancy outcomes, and negative health consequences to women and children.  Inst. of Med., *Clinical Preventive Services for Women, Closing the Gaps*, at 102-109 (July 19, 2011) ("IOM Rep.").

25.     Contraception prevents unintended pregnancy, which can have severe negative consequences for both women and their children.  During an unintended pregnancy, a woman is more likely to receive delayed or no prenatal care, to be depressed, and to suffer from domestic violence.  *Id.* at 103.  An unintended pregnancy may result in preterm birth and low birth weight among children.  *Id.*

26.     Contraception also allows women to postpone pregnancy and optimally space their children to avoid adverse consequences (*e.g.*, low birth weight, premature birth) associated with more than one pregnancy in 18 months.  *Id.* at 103.

8

27.     Contraception is highly effective in treating and preventing certain health conditions.  Contraception decreases the risk of certain cancers (such as endometrial and ovarian cancer), manages menstrual disorders, and protects against pelvic inflammatory disease and some benign breast diseases.  *Id.* at 107.

28.     In addition, pregnancy may be dangerous to some women due to certain chronic medical conditions such as diabetes, obesity, pulmonary hypertension, and heart disease.  *Id.* at 103.  When pregnancy is contraindicated, women may need contraception to delay pregnancy until their medical conditions are under control or to prevent pregnancy throughout their lives. *Id.* at 103-4.

29.     In a nationally representative study conducted in 2013, 21% of women said they used contraceptives to prevent pregnancy and manage a medical condition, while 7% used contraceptives solely to manage a medical condition.  A. Salganikoff, *et al*., Kaiser Family Found., *Women and Health Care in the Early Years of the Affordable Care Act* 35 (May 2014), https://kaiserfamilyfoundation.files.wordpress. com/2014/05/8590-women-and-health-care-in-the-early-years-of-the-affordable-care-act.pdf.

30.     Women also rely on contraception to prevent or delay pregnancy during public health crises, such as the outbreak of the Zika virus.

31.     Access to contraception has been proven to advance women's equality and participation in the social and economic life of this country.  Studies show that contraception is directly linked to women's increased educational and professional opportunities, and increased lifetime earnings.  *See, e.g.,* Jennifer J. Frost & Laura Duberstein Lindberg, *Reasons for Using Contraception: Perspectives of US Women Seeking Care at Specialized Family Planning Clinics*, 87 CONTRACEPTION 465, 467 (2013); Adam Sonfield, *et al*., Guttmacher Inst., *The Social*

*and Economic Benefits of Women's Ability to Determine Whether and When to Have Children*

(2013), *available at* http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

32.     There are various methods of contraception approved by the U.S. Food and Drug

Administration ("FDA"), which vary in effectiveness, duration, side effects, methods of action,

and ease of use.  Not all women can tolerate all forms of contraception, and as the FDA has said:

"No one product is best for everyone."  U.S. Food & Drug Admin., Birth Control Guide,

https://www.fda.gov/downloads/ForConsumers/ByAudience/ForWomen/FreePublications/UCM

517406.pdf.  Thus, women need insurance coverage of all FDA-approved methods,

contraceptive counseling, and education to find the most appropriate method for them.

33.     Women using contraception also need insurance coverage for the associated

services, to assist them in understanding their contraceptive options through counseling with a

health care provider, and to ensure the effectiveness and safety of their chosen form of

contraception.  Women  using IUDs, for example, need ongoing medical monitoring and

treatment to address potential complications such as migration of the device, IUD reinsertion,

heavy menstrual bleeding, pain, and for IUD removal.

34.     Cost is often an impediment to women using contraception.  Cost can influence

women to avoid more effective but more expensive methods of contraception or forgo

contraceptives altogether.

35.     The most effective methods of contraception carry large up-front costs that make

them unaffordable for many women.  For example, an IUD can cost up to $1,000.

36.     Studies show that the costs associated with contraception, even when small, lead

women to forgo it completely, to choose less effective methods, or to use it inconsistently.  *See, e.g.,*

Guttmacher Inst., *A Real-Time Look at the Impact of the Recession on Women's Family Planning and Pregnancy Decisions* 5 (Sept. 2009), http://www.guttmacher.org/pubs/RecessionFP.pdf.

37.     When the costs of contraception lead women to forgo it completely, choose less effective methods, or use it inconsistently, there is an increased risk of unintended pregnancy. *See, e.g.*, Rachel Benson Gold, *The Need for and Cost of Mandating Private Insurance Coverage for Contraception*, 1 Guttmacher Rep. on Pub. Pol'y 5, 6 (1998).

38.     Cost barriers to contraception in and of themselves not only threaten the economic security of women and their families, but in undermining access to contraception, they also threaten women's long-term financial well-being, job security, workforce participation, and educational attainment.

### The ACA and the Contraceptive-Coverage Requirement

39.     Since it was passed by Congress and signed by the President on March 23, 2010, the ACA has extended accessible and affordable health-insurance coverage to millions of Americans.

40.     To ensure that health insurance remains accessible and affordable, the ACA contains a number of critical provisions.  Among these provisions is the requirement that group health plans include insurance coverage for preventive health services with no cost sharing.  42 U.S.C. § 300gg-13(a).  Section 1554 of the ACA also prohibits government regulations that would impede access to health services.  42 U.S.C. § 18114.  And Section 1557 prohibits discrimination, including on the basis of sex, in any health program or activity that receives federal financial assistance.  42 U.S.C. § 18116.

41.     To protect women's health, ensure that women do not pay more for insurance coverage than men, and to advance women's equality and well-being, Congress included the Women's Health Amendment in the ACA.  The Women's Health Amendment requires insurance

plans to cover certain women's preventive health services without cost sharing.  42 U.S.C.
§ 300gg-13(a)(4).

42.     Prior to the ACA's enactment, insurers had not consistently covered women's preventive health services.  As a result, women had historically paid much more in out-of-pocket costs than men had for basic and necessary preventive care, and in some instances, women were unable to obtain this care at all due to cost barriers.  Congress, therefore, included the Women's Health Amendment in the ACA to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to combat other forms of widespread sex discrimination in the health-insurance market.  155 Cong. Rec. S12,021, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski).

43.     Congress specifically intended for the Women's Health Amendment to improve women's health care by providing "affordable family planning services" to "enable women and families to make informed decisions about when and how they become parents." 155 Cong. Rec. S12,033, S12,052 (daily ed. Dec. 1, 2009) (statement of Sen. Franken).

44.     Under the Women's Health Amendment, Congress required the Health Resources and Services Administration ("HRSA"), a component of HHS, to adopt guidelines on the women's preventive care services that must be covered under the ACA without cost sharing.

45.     Before issuing the Guidelines, HRSA commissioned the Institute of Medicine (now the National Academy of Medicine) to convene a committee of experts on women's health, adolescent health, disease prevention, and evidence-based guidelines to conduct a comprehensive review of women's preventive health needs and produce a report.  *See* IOM Report (2011). Based on detailed findings—including findings that access to contraception reduces unintended pregnancies, abortions, adverse pregnancy outcomes, and negative health consequences to

women and children, and that even small cost-sharing requirements significantly reduce the use of contraception—this expert committee recommended that HRSA include the "full range of Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity" as one of eight critical preventive services for women.  *Id.* at 109-110.

46.     On August 1, 2011, HRSA adopted the required Guidelines, which accepted the Institute of Medicine's recommendation on contraception and seven other preventive services for women in full.  *See* HRSA, *Women's Preventive Services Guidelines*, http://hrsa.gov/womens-guidelines.

47.     HRSA has not changed the Guidelines regarding which women's preventive services must be covered for a group or individual health plan to comply with the ACA: contraceptive methods and counseling remain required benefits.  *See* HRSA, *Women's Preventive Services Guidelines*, http://hrsa.gov/womens-guidelines.  As recently as December 2016, a panel of experts convened by the American College of Obstetricians and Gynecologists, through a cooperative agreement with HRSA, reaffirmed the importance of the ACA's contraceptive-coverage requirement.  Women's Preventive Services Initiative, *Recommendations for Preventive Services for Women* (2016), https://www.womenspreventivehealth.org/final-report/.

48.     After the IOM report and years of comments on exemptions and accommodations concerning contraceptive coverage, the three departments primarily responsible for implementing the Women's Health Amendment—the Departments of Health and Human Services, Labor, and Treasury (collectively the "Departments")—finalized the preventative services regulations, which required coverage of all the women's preventive care services

outlined in the Guidelines, including all FDA-approved forms of contraception and related

education and counseling for women.  *See* 45 C.F.R. § 147.130(a)(1)(iv) (HHS); 29 C.F.R.

§ 2590.715-2713(a)(1)(iv) (Labor); and 26 C.F.R. § 54.9815-2713(a)(1)(iv) (Treasury).

49.     The Departments have stated that contraceptive services were included in these

regulations based on the regulatory finding that "cost sharing can be a significant barrier to

effective contraception" and that "[c]ontraceptive coverage, by reducing the number of

unintended and potentially unhealthy pregnancies, furthers the goal of eliminating [the gender]

disparity [in health coverage] by allowing women to achieve equal status as healthy and

productive members of the job force."  77 Fed. Reg. 8,725, 8,728 (Feb. 15, 2012).

### Religious Objections to Contraceptive Coverage and the Accommodation Process

50.     Houses of worship were and continue to be exempt from the ACA's

contraceptive-coverage requirement.

51.     Certain religiously-affiliated employers and universities that did not qualify for

the exemption objected to providing health-insurance coverage for contraception to their

employees and students and their dependents.  To accommodate these entities' objections, while

still ensuring that women at the objecting entities received access to seamless, affordable

contraceptive coverage, the Departments developed and made available an accommodation for

certain religiously-affiliated nonprofit institutions.  *See* 78 Fed. Reg. 39,870, 39,871 (July 2,

2013).

52.     The Departments made the accommodation final only after reviewing over

600,000 comments on the Advance Notice of Proposed Rulemaking and proposed rules.

53.     The accommodation was later extended to certain closely held, for-profit entities

with religious objections to contraception in response to the U.S. Supreme Court's decision in

*Hobby Lobby*. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014); 80 Fed. Reg.

41,318 (July 14, 2015). The federal government finalized the extension of the accommodation

only after reviewing 75,000 comments in response to the related Notice of Proposed Rulemaking.

54.     The accommodation allows an objecting entity either to sign a one-page form

stating its objection to providing contraceptive coverage and submit that form to the federal

government or to notify the entity's insurance company.  26 C.F.R. § 54.9815-2713A(a), (c)–(d).

55.     After this notification, the insurance company or third-party administrator must

provide contraceptive coverage without cost sharing directly to the affected women. *Id.* Thus,

under the accommodation, an objecting entity is entirely relieved of contracting, arranging,

paying, or referring for contraception services, while the women who are employees or students,

and their dependents, at the entity receive the required coverage from their regular insurance

company.

56.     Entities that were eligible for the accommodation nevertheless challenged it,

contending that merely filling out the accommodation form violated the Religious Freedom

Restoration Act ("RFRA") and the U.S. Constitution.  The objecting employers argued that

providing notification in order to opt out of the ACA's contraceptive-coverage requirement is a

"trigger" to women getting contraceptive coverage, even though the objecting entity has no role

whatsoever in providing contraceptive coverage under the accommodation.

57.     Some of these entities filed lawsuits around the country.  Eight of the nine federal

circuit courts of appeal to consider these cases flatly rejected these challenges.  *See, e.g., Little*

*Sisters of Poor House v. Burwell*, 794 F.3d 1151 (10th Cir. 2015); *Geneva Coll. v. Sec'y U.S.*

*Dep't of Health & Human Servs.*, 778 F.3d 422 (3d Cir. 2015); *Priests for Life v. U.S. Dep't of*

*Health & Human Servs*., 772 F.3d 229 (D.C. Cir. 2014); *but see Dordt Coll. v. Burwell*, 801 F.3d 946 (8th Cir. 2015).

58.    The U.S. Supreme Court granted certiorari in seven of the cases, and ultimately vacated and remanded with the instruction that the parties "should be afforded an opportunity to arrive at an approach going forward that accommodates [the entities'] religious exercise ***while at the same time ensuring that women covered by [the entities'] health plans receive full and equal health coverage, including contraceptive coverage*.**"   *Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016) (citation and internal quotation marks omitted) (emphasis added).

59.    On July 22, 2016, in light of the Supreme Court's decision in *Zubik*, the Departments issued a Request for Information ("RFI") to solicit from interested parties comments on "whether there are alternative ways (other than those offered in current regulations) for eligible organizations that object to providing coverage for contraceptive services on religious grounds to obtain an accommodation, while still ensuring that women enrolled in the organizations' health plans have access to seamless coverage of the full range of Food and Drug Administration-approved contraceptives without cost sharing."  81 Fed. Reg. 47,741 (July 22, 2016).

60.    On January 9, 2017, in response to 54,000 comments received in response to the RFI, the federal government concluded: "the comments reviewed by the Departments in response to the RFI indicate that no feasible approach has been identified at this time that would resolve the concerns of religious objectors, while still ensuring that affected women receive full and equal health coverage, including contraceptive coverage."  Dept. of Labor, FAQs About Affordable Care Act Implementation Part 36, at 4 (Jan. 9, 2017), *available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-

part-36.pdf.  Hence, "the Departments continue to believe that the existing accommodation regulations are consistent with RFRA...." *Id.* at 4-5.

61.     Meanwhile, the various *Zubik* cases were held in abeyance while the parties attempted to work out a settlement.  According to court filings in those cases, the federal government met with entities challenging the coverage requirement numerous times to discuss a resolution of the accommodation process.  Neither Plaintiffs nor the public at large have been allowed to participate in that process.

62.     In status reports to the courts in the *Zubik* cases, the federal government abruptly indicated that it was creating a new rule.

### The Trump Administration and the Rules

63.     Despite the Supreme Court's clear order in *Zubik* to find an approach that "ensur[es] that women covered by [the employers'] health plans receive full and equal health coverage, including contraceptive coverage," President Trump issued an Executive Order on May 4, 2017 titled:  "Promoting Free Speech and Religious Liberty," which directed issuance of the type of Rules challenged here.  Exec. Order No. 13,798, 82 Fed. Reg. 21,675 (May 4, 2017).

64.     The Order states that, regarding the "Conscience Protections with Respect to Preventive-Care Mandate," "[t]he Secretary of the Treasury, the Secretary of Labor, and the Secretary of Health and Human Services shall consider issuing amended regulations, consistent with applicable law, to address conscience-based objections to the preventive-care mandate promulgated under section 300gg-13(a)(4) of title 42, United States Code."

65.     Without any public notice and comment or other pre-enactment mechanism for receiving input from the public, the Departments issued the new Rules on October 6, 2017.

66.     The Rules dramatically expand the scope of the exemptions and the types of entities that can claim an exemption, thereby denying Plaintiffs and other women coverage to which they are entitled.

67.     The Rules broaden the entities eligible for an exemption so that any university, nonprofit, for-profit business (whether publicly or privately held), or other non-governmental employer may refuse to cover contraception in its group health insurance plans without notifying the government or anyone else.  45 C.F.R. §§ 147.132(a)(1), 147.133(a)(1) (as amended).

68.     The Rules broaden the permissible reasons for seeking the exemption from sincerely held religious beliefs to sincerely held religious beliefs or sincerely held moral convictions.  45 C.F.R. §§ 147.132(a)(2), 147.133(a)(2) (as amended).

69.     The Rules allow an individual with moral or religious objections to request a plan without contraceptive coverage, and a health insurance issuer offering group or individual coverage may provide a separate policy to the objecting individual without contraceptive coverage.  45 C.F.R. §§ 147.132(b), 147.133(b) (as amended).

70.     The Rules allow health insurance issuers with religious or moral objections to refuse to provide contraceptive coverage, forcing non-objecting employers and universities in those plans to find a new issuer or somehow independently provide contraceptive coverage.  45 C.F.R. §§ 147.132(a)(1), 147.133(a)(1) (as amended).

71.     The Rules also make optional the previously required accommodation process for objecting entities.  The accommodation process ensured that employees and students would continue to receive seamless contraceptive coverage.  Under the Rules, however, an employer, university, or insurance issuer may claim an exemption and deny coverage and the insured will no longer have seamless contraceptive coverage through her regular insurance plan.

72.     These Rules took effect immediately on October 6, 2017.

73.     These Rules took effect without any notice or opportunity for public comment.

**Impacts of the Rules**

74.     The expanded exemptions that the Rules provide effectively nullify the existing regulations requiring contraceptive coverage—regulations that took over six years to promulgate; included multiple consultations with expert committees; and involved no less than six rounds of notice-and-comment rulemaking in the form of Advanced Notices of Proposed Rulemaking, Notices of Proposed Rulemaking, Interim Final Rules with comment periods, and Requests for Information, that together involved more than 725,000 comments.

75.     The expanded exemptions allow any employer or university to evade the contraceptive-coverage requirement for any religious or moral reason and harm women by imposing their religious and moral views on employees and students.

76.     The Rules create a major change in law.

77.     Defendants made these changes without constitutional or statutory authority or statutorily-mandated notice-and-comment procedure.

78.     The Rules establish and adopt one subset of religious views while denying health care to those with different views—including Plaintiff Alicia Baker.  The result is that Plaintiffs and other women are denied coverage for contraception and related services and thus are harmed.

79.     The Rules jeopardize the health, economic security, and equality of over 62 million women who currently have coverage for all FDA-approved contraceptive methods and related education and counseling without out-of-pocket costs.  *See* Nat'l Women's Law Center, *New Data Estimate 62.4 Million Women Have Coverage of Birth Control without Out-of-Pocket*

*Costs* (Sept. 2017), *available at* https://nwlc.org/resources/new-data-estimate-62-4-million-women-have-coverage-of-birth-control-without-out-of-pocket-costs/.

80.     The Rules reinstate the cost barriers to contraceptive care.

81.     Additionally, the Rules impose significant other informational, administrative, and logistical burdens on Plaintiffs and other women who will need to navigate finding other sources of contraceptive care.

82.     Some women will not be able to access contraception at all due to the Rules.

83.     Congress included the Women's Health Amendment in the ACA to improve women's health by removing cost and access barriers, protect women's economic security, and remedy systemic sex discrimination in the insurance market.  Yet these Rules, by allowing employers, universities, and insurance issuers to exempt themselves from the contraceptive-coverage requirement, target women for adverse treatment and directly undermine those legislative purposes.

84.     The Rules create an unreasonable barrier to critical health care services for Plaintiffs and millions of other women.

### FIRST CAUSE OF ACTION

### (Administrative Procedure Act—Procedurally Arbitrary and Capricious)

85.     The foregoing allegations are re-alleged and incorporated by reference as if restated fully herein.

86.     Plaintiffs are entitled to relief under the Administrative Procedure Act because the Departments did not follow procedures required by law for agency rulemaking.

87.     The Administrative Procedure Act requires courts to "hold unlawful and set aside" agency action taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

88.     HHS, the Department of Labor, and the Department of the Treasury are "agencies" under the Administrative Procedure Act.  *See* 5 U.S.C. § 551(1).

89.     The challenged Rules qualify as rules under the Administrative Procedure Act.

90.     With exceptions not applicable here, a federal agency must provide the public notice of and an opportunity to comment on a proposed rulemaking.  5 U.S.C. § 553.

91.     Defendants promulgated the Rules in violation of 5 U.S.C. § 553.

92.     Defendants did not have good cause or statutory authority to forgo notice-and-comment rulemaking or to waive the 30-day waiting period between publication and effective date.

93.     Absent injunctive and declaratory relief, Plaintiffs have been and will continue to be harmed.

## SECOND CAUSE OF ACTION

**(Administrative Procedure Act—Substantively Arbitrary and Capricious, Abuse of Discretion, Contrary to Constitution and Statute)**

94.     The foregoing allegations are re-alleged and incorporated by reference as if restated fully herein.

95.     Plaintiffs are entitled to relief under the Administrative Procedure Act because the Rules are illegal under the Constitution and federal statutes.

96.     The Administrative Procedure Act requires courts to "hold unlawful and set aside" any agency action, finding, or conclusion that is "arbitrary and capricious," "not in accordance with the law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory . . . authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)-(C).

97.     The Rules are contrary to the Establishment Clause of the First Amendment.

98.     The Rules are contrary to the Due Process Clause of the Fifth Amendment because they deny the right to liberty.  The Rules also are contrary to the equal protection guarantees of the Due Process Clause of the Fifth Amendment because they discriminate based on sex and religion.

99.     The Rules are not in accordance with the ACA requirement that group health plans or individual health insurance cover the preventive care services identified in HRSA's Women's Preventive Service Guidelines because the Rules exempt coverage of services specified in the Guidelines.  Women's Health Amendment, 42 U.S.C. § 300gg-13(a)(4).

100.    The Rules are not in accordance with Section 1554 of the ACA, 42 U.S.C. § 18114, because they create unreasonable barriers to the ability of individuals to obtain appropriate medical care and impede timely access to health-care services.

101.    The Rules are not in accordance with Section 1557 of the ACA, 42 U.S.C. § 18116, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, because they discriminate on the basis of sex.

102.    Defendants exceeded their statutory authority by issuing Rules that do away with the requirement for coverage of contraceptives without cost sharing for Plaintiffs and millions of women under 42 U.S.C. § 300gg-13(a)(4).  Thus, Defendants violated 5 U.S.C. § 706(2)(C).

103.    The Rules were adopted with no valid justification.  Thus, Defendants' issuance of the rules was arbitrary and capricious and violates 5 U.S.C. § 706(2)(A).

104.    Because Defendants' actions are "not in accordance with law," "contrary to constitutional right," "arbitrary and capricious," and in excess of statutory authority and short of statutory right, Defendants have violated the Administrative Procedure Act.

105.     Absent declaratory and injunctive relief, Defendants' violations will cause ongoing harm to Plaintiffs.

## THIRD CAUSE OF ACTION

### (First Amendment—Violation of the Establishment Clause)

106.     The foregoing allegations are re-alleged and incorporated by reference as if restated fully herein.

107.     Plaintiffs are entitled to relief because the Rules subject and will continue to subject Plaintiffs to deprivations of their rights under the Establishment Clause of the First Amendment to the U.S. Constitution.

108.     The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion."

109.     Defendants have violated, and will continue to violate, Plaintiffs' rights under the Establishment Clause, including in the following ways:

a.     The Rules provide a religious exemption from the ACA that will harm Plaintiffs and other women by depriving them of, or limiting their access to, contraceptive services, a critical women's preventive health service.

b.     The Rules constitute governmental conduct that has and will continue to have the primary purpose and principal effect of promoting, advancing, and endorsing religion.

c.     The Rules excessively entangle the government with religion.

110.     Absent declaratory and injunctive relief, Defendants' violations will cause ongoing harm to Plaintiffs.

## FOURTH CAUSE OF ACTION

**(Fifth Amendment—Equal Protection and Due Process)**
**(Sex, Religion, and Right to Liberty)**

111.    The foregoing allegations are re-alleged and incorporated by reference as if restated fully herein.

112.    The Due Process Clause of the Fifth Amendment prohibits the government from denying fundamental rights such as the right to liberty and from denying equal protection of the laws, including on the basis of sex and religion.

113.    The Rules deny Plaintiffs due process by interfering with the right to contraception, which is encompassed by the fundamental right to liberty provided by the Constitution.

114.    The Rules do not further a compelling governmental interest and are not tailored to achieve those interests.

115.    The Rules deny Plaintiffs the equal protection of the laws because the expansive exemptions that they create impermissibly target women for adverse treatment.

116.    The Rules deny Plaintiffs the equal protection of the laws by endorsing one set of religious beliefs to the exclusion of others.

117.    Defendants cannot proffer any legitimate justification for the Rules, let alone an exceedingly persuasive or compelling justification.

118.    Absent declaratory and injunctive relief, Defendants' violations will cause ongoing harm to Plaintiffs.

## FIFTH CAUSE OF ACTION

### (Section 1557 of the ACA—Sex Discrimination)

119.    The foregoing allegations are re-alleged and incorporated by reference as if restated fully herein.

120.    Section 1557 prohibits discrimination on the basis of sex in "any health program or activity, any part of which is receiving Federal financial assistance . . . or under any program or activity that is administered by an Executive Agency."  42 U.S.C. § 18116.

121.    The Rules violate Section 1557 of the ACA, 42 U.S.C. § 18116, because they target women for adverse treatment and thus discriminate on the basis of sex.

122.    Absent declaratory and injunctive relief, Defendants' violations will cause ongoing harm to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a.    Declare that the Rules were issued in violation of, and violate, the Administrative Procedure Act, the First and Fifth Amendments of the U.S. Constitution, and the ACA;

b.    Enter a permanent injunction prohibiting Defendants from implementing or enforcing the Rules;

c.    Retain jurisdiction until Defendants have fully satisfied their court-ordered obligations;

d.    Award Plaintiffs attorneys' fees and costs, as provided by any applicable statute or regulation and the inherent power of the Court; and,

e.    Grant all further and additional relief that the Court may determine is just and proper.

Dated:  October 31, 2017          Respectfully submitted,

/s/ Leah R. Bruno
Leah R. Bruno
*Dentons US LLP*
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361
Telephone:  (312) 876-7456
leah.bruno@dentons.com

Tami Lyn Azorsky*
Christina M. Carroll*
Leslie A. Barry*
*Dentons US LLP*
1900 K Street, NW
Washington, DC 20006
Telephone:  (202) 496-7500
tami.azorsky@dentons.com
christina.carroll@dentons.com
leslie.barry@dentons.com

Richard B. Katskee*
Kelly M. Percival*
*Americans United for Separation of Church and State*
1310 L Street, NW, Suite 200
Washington, DC 20005
Telephone:  (202) 466-3234
katskee@au.org
percival@au.org

Fatima Goss Graves*
Gretchen Borchelt*
Sunu Chandy*
Mara K. Gandal-Powers*
Erika Hanson*
*National Women's Law Center*
11 Dupont Circle, NW, Suite 800
Washington, DC 20036
Telephone:  (202) 588-5180
fgossgraves@nwlc.org
gborchelt@nwlc.org
mgandal-powers@nwlc.org
schandy@nwlc.org
ehanson@nwlc.org

*Attorneys for Plaintiffs* (* Motion for *pro hac vice*
forthcoming.)

26