THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA

MARY SHIRAEF *et al.*,

        Plaintiffs,

        v.

ERIC HARGAN, *et al.*,

        Defendants.

Civil Action No. 3:17-cv-0817 (PPS-MGG)

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## INTRODUCTION

These plaintiffs do not have standing because they have not been injured by Defendants' conduct, and have not supported their contention that they face a certainly impending future injury. This Court should therefore dismiss this case.

In 2010, as part of the Affordable Care Act (ACA), Congress enacted a provision requiring employers to cover some recommended preventive services for women without cost-sharing.  The Health Resources and Services Administration (HRSA), an agency within the Department of Health and Human Services (HHS), implemented the provision by issuing guidelines in 2011 that required coverage for women of all Food and Drug Administration (FDA)-approved contraceptives without cost-sharing—a requirement also known as the contraceptive mandate.  At the same time, the government recognized that some churches hold sincere religious objections to providing coverage for contraception, and exempted such churches, church conventions and the exclusively religious activities of religious orders from that mandate if they met certain requirements.

Years of litigation ensued. In October 2017, in an effort to address serious religious and moral objections and finally bring the litigation to a close, the Departments of Health and Human Services, Labor, and the Treasury (Agencies) issued interim final rules (IFRs) that keep the contraceptive mandate in place, exempt religious and moral objectors from having to include contraceptive coverage in insurance plans offered to their employees or students, but maintain the accommodation as a voluntary option for organizations that would otherwise be exempt. *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the ACA, 82 Fed. Reg. 47,792 (Oct. 13, 2017) (Religious Exemption Rule); Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the ACA, 82 Fed. Reg. 47,838 (Oct. 13, 2017) (Moral Exemption Rule) (collectively, Rules).

Plaintiffs, Mary Shiraef, Alicia Baker, and Jane Does 1, 2, and 3, are residents of Indiana who use contraception. They are all currently being provided with contraceptive coverage without cost sharing. *See* Compl. ¶ 7–12.[1] Ms. Shiraef and Jane Does 1 and 2 are students at the University of Notre Dame. *Id.* ¶ 7–9. They allege that they will lose their access to contraceptive coverage without cost sharing because "the University has announced its intention to take advantage of the Rules." *Id.* In fact, the University has announced that its third-party administrator will provide contraceptive coverage to its employees and students at no cost. *See* "Notre Dame Employees and Students Recover Birth Control Coverage," University of Notre Dame Scholastic Magazine, (Nov. 9, 2017), https://scholastic.nd.edu/issues/notre-dame-employees-and-students-recover-birth-control-coverage, attached as Ex. A. Ms. Baker works for a church that does not oppose

---

[1] Plaintiffs have not moved for leave to proceed anonymously. Defendants reserve the right to object to any such motion to the extent that discovery would be needed against the Jane Doe plaintiffs to determine their standing. Because it is clear from the face of the complaint and judicially noticeable materials that these plaintiffs lack standing, however, the issue need not be addressed at this time.

contraceptive coverage. Compl. ¶ 12. The Complaint alleges that she "expect[s]" to lose her contraceptive coverage because the third-party administrator (TPA) of her health insurance plan objects to the contraceptive coverage mandate. *Id.* But she has not alleged that her TPA or her employer have announced any changes to her contraceptive coverage. *See id.* Jane Doe 3 is employed by an unnamed Illinois university that opposes contraceptive coverage. *Id.* ¶ 10. Like Ms. Baker, she "expect[s]" that she will be subject to the Rules because her employer and her TPA object to providing coverage. *Id.* But Doe 3 has not alleged that her employer or her TPA have announced any changes to her coverage. *See id.*

This Court lacks jurisdiction over this lawsuit because Plaintiffs have alleged purported injuries based either on facts that are incorrect, or on the speculative possibility that they will be injured at some indefinite time in the future. Accordingly, they lack Article III standing—they have no current injury and cannot show that any potential future injury is certainly impending. In addition, their claims are unripe. Defendants therefore respectfully ask this Court to dismiss Plaintiffs' complaint for lack of jurisdiction.

## BACKGROUND

The contraceptive mandate arises from agency regulations issued under the authority of the ACA. Patient Protection and Affordable Care Act (PPACA), Pub. L. No. 111–148, 124 Stat. 119 (2010), *as amended by* Pub. L. No. 111–152, 124 Stat. 1029 (2010). The ACA does not specifically refer to contraception, but it requires group health plans and health insurance issuers that offer group or individual health coverage to cover, "with respect to women, such additional preventive care and screenings not described in [§ 300gg-13(a)(1)] as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [HRSA]." 42 U.S.C. § 300gg-13(a)(4). In 2010, the Agencies issued a set of IFRs to begin the

process of implementing the preventive services requirements.  75 Fed. Reg. 34,538, 34,540 (June 17, 2010).  HRSA adopted guidelines that defined the covered preventive services to include, among other things, the full range of FDA-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity.  *See* HRSA, Women's Preventive Services: Required Health Plan Coverage Guidelines (Guidelines), http://www.hrsa.gov/womens-guidelines.

Since the ACA's enactment, the Agencies have consistently sought to accommodate religious objections to the contraceptive mandate.  In 2011, the Agencies issued IFRs exempting certain religious employers, *see* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the PPACA, 76 Fed. Reg. 46,621, 46,623-25 (Aug. 3, 2011), and created a limited safe-harbor for certain other non-profit organizations, HHS, Guidance on the Temporary Enforcement Safe Harbor, at 1 n.1 & 3 (Feb. 10, 2012), https://go.usa.gov/xnZBN.  After considering thousands of comments, the Agencies issued final regulations that adopted the IFRs' definition of a religious employer.  77 Fed. Reg. 8,725–27 (Feb. 15, 2012).

Dozens of organizations and individuals filed lawsuits seeking a broader exemption, alleging that the contraceptive mandate violated their rights under the Religious Freedom Restoration Act (RFRA).  *See Archdiocese of St. Louis v. Burwell*, 28 F. Supp. 3d 944, 954 (E.D. Mo. 2014) (citing cases).  In many of these lawsuits, courts enjoined enforcement of the contraceptive mandate.  To resolve these religious objections, the Agencies engaged in notice-and-comment rulemaking, and, in 2013, they issued new final rules broadening the definition of a religious employer.  78 Fed. Reg. 39,870, 39,889, 39,896 (July 2, 2013).  The 2013 final rules also established an accommodation process by which group health plans established or maintained by

eligible organizations could self-certify their objections to their issuers or third-party administrators (TPAs), and the issuer or TPA would then independently arrange for the provision of contraceptive services without cost sharing. *Id.* at 39,874–80, 39,896.

However, the 2013 final rules did not resolve the litigation challenging the contraceptive mandate. In 2014, the Supreme Court held that the contraceptive mandate violated RFRA as applied to closely held for-profit corporations with sincere religious objections to providing contraceptive coverage. *Burwell v. Hobby Lobby*, 134 S. Ct. 2751, 2775 (2014). The Supreme Court did not rule in *Hobby Lobby* on whether the accommodation process satisfied the government's obligations under RFRA toward those with religious objections to that process. But just one week later, in *Wheaton College*, the Supreme Court identified an alternative form of accommodation that did not require the employer to notify its insurer or TPA. *See Wheaton Coll. v. Burwell*, 134 S. Ct. 2806, 2807–08 (2014). In light of these developments, the Agencies issued a third set of IFRs, along with a notice of proposed rulemaking, both of which they later finalized by rule. Coverage of Certain Preventive Services Under the ACA, 79 Fed. Reg. 51,092 (Aug. 27, 2014); 79 Fed. Reg. 51,118 (Aug. 27, 2014); 80 Fed. Reg. 41,318, 41,324 (July 14, 2015).

Still, litigation continued, and the Supreme Court granted certiorari in *Zubik v. Burwell* to consider whether the accommodation process satisfied the government's RFRA obligations toward non-profit religious entities with sincere religious objections to that process. 136 S. Ct. 1557 (2016). The Supreme Court vacated and remanded without resolving the issue, hoping that the parties could "resolve any outstanding issues between them" "[i]n light of the . . . substantial clarification and refinement in the positions of the parties." *Id.* at 1560. But, after considering over 54,000 public comments on options for modifying the accommodation process, the Agencies were unable to find a way to amend the accommodation to satisfy all objecting organizations while

pursuing the Agency's policy goals. *See* FAQs About ACA Implementation Part 36 (Jan. 9, 2017), https://dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf. Thus, the litigation on remand after *Zubik*—involving dozens of cases and dozens of plaintiffs—remained unresolved.

On May 4, 2017, the President issued an "Executive Order Promoting Free Speech and Religious Liberty," Exec. Order No. 13,798, 82 Fed. Reg. 21,675 (May 4, 2017), instructing the Agencies to "consider issuing amended regulations, consistent with applicable law, to address conscience-based objections to the preventive-care mandate promulgated under section 300gg-13(a)(4)." Consistent with the Order, the Agencies "reexamine[d] the exemption and accommodation scheme currently in place for the Mandate," and issued the Rules at issue here on October 6, 2017, requesting public comments by December 5, 2017. Religious Exemption Rule, 82 Fed. Reg. at 47,799; *accord* Moral Exemption Rule, 82 Fed. Reg. 47,838.

The Religious Exemption Rule expands the exemption for non-governmental plan sponsors that object to providing coverage for all or a subset of contraceptive services based on their sincerely held religious beliefs. 45 C.F.R. § 147.132(a)(2). The Moral Exemption Rule exempts certain non-governmental plan sponsors that object to providing all or a subset of contraceptive services based on sincerely held moral convictions. *Id.* § 147.133(a)(2). As under the previous rule, exempt entities are not required to self-certify, but remain subject to regulatory disclosure requirements for plan exclusions or reductions in a covered benefit. 82 Fed. Reg. at 47,808 & n.54; *id.* at 47,804 & n.32. The Rules maintain the accommodation process as an optional mechanism to provide contraceptive coverage for women covered by the plans of exempt entities that choose to use it. 45 C.F.R. § 147.131; 26 C.F.R § 54.9815-2713A; 29 C.F.R. § 2590.715-

2713A.  On October 6, 2017, HRSA updated its Guidelines to exempt entities and individuals that qualify for exemptions from the Guidelines' requirements.[2]  *See* Guidelines.

## STANDARD OF REVIEW

Federal courts "are courts of limited subject matter jurisdiction." *Civil City of South Bend v. Consol. Rail Corp.*, 880 F. Supp. 595, 598 (N. D. Ind. 1995) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994)); *cf.* Fed. R. Civ. P. 12(b)(1) (requiring dismissal of a complaint where the court lacks subject matter jurisdiction).  The court must "presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (citation omitted); *Schumacher v. Principal Life Ins. Co.*, 665 F. Supp. 970, 978 (N.D. Ind. 2009) (citing *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999)).  The plaintiff bears the burden of establishing jurisdiction, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and in evaluating a motion to dismiss the court accepts as true the allegations of the complaint and "construe[s] the complaint in favor of the complaining party." *Evans v. First Fed. Sav. Bank of Ind.*, 669 F. Supp. 915, 917 (N.D. Ind. 1987) (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Haroco, Inc. v. Am. Nat'l Bank and Trust Co.*, 747 F.2d 384, 385 (7th Cir. 1984)).

## ARGUMENT

This Court lacks jurisdiction, both because the Plaintiffs lack standing to pursue their claims, and because their claims, if any injury exists, are unripe.

---

[2] The Eastern District of Pennsylvania and the Northern District of California have granted plaintiffs' motions for preliminary injunctions in two cases challenging the Rules at issue in this case.  *See Pennsylvania v. Trump*, No. CV 17-4540-WB, 2017 WL 6398465 (E.D. Pa. Dec. 15, 2017); *California v. U.S. Dep't of Health & Human Servs.*, No. 17-CV-05783-HSG, 2017 WL 6524627 (N.D. Cal. Dec. 21, 2017).  Defendants believe these cases were wrongly decided, and that they should have no effect on this Court's consideration of this Motion to Dismiss.

### 1. The Court Should Dismiss This Case Because Plaintiffs Lack Standing.

The Supreme Court articulated the "irreducible constitutional minimum" for Article III standing in *Lujan v. Defenders of Wildlife*, 504 U.S. at 560 (1992). First, the plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citation omitted). Second, there "must be a causal connection between the injury and the conduct complained of—the injury has to be fairly trace[able] to the challenged action of the defendant." And third, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (citation omitted). As this is a jurisdictional requirement, the plaintiff bears the burden of establishing standing. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). Indeed, because standing is "not [a] mere pleading requirement[] but rather an indispensable part of the plaintiff's case, [it] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

A potential future injury satisfies Article III only if it is "actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). In other words, the injury must be "*certainly* impending"—"'[a]llegations of *possible* future injury' are not sufficient.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted); *see also Lujan*, 504 U.S. at 564 n.2 (holding that a plaintiff who "alleges only an injury at some indefinite future time" has not shown an injury in fact; "the injury [must] proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all").

These Article III standing requirements ensure that legal questions are "resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic

appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982); *cf. Clapper*, 568 U.S. at 408 ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.") (citations omitted). Because standing reflects separation-of-powers concerns, the inquiry is "especially rigorous" where, as here, a plaintiff asks a federal court "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

A challenge to standing on a motion to dismiss may be either facial or factual. "Facial challenges require only that the court look to the complaint and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Apex Digital*, 572 F.3d at 443. On the other hand, a factual challenge alleges that "the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction." *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds*, *Minn-Chem v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012).[3] When considering a motion to dismiss that attacks jurisdiction as a factual matter, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Evers v. Astrue*, 536 F.3d 651, 656–57 (7th Cir. 2008) (citation omitted).

Plaintiff must establish standing for each plaintiff individually—that one Plaintiff has established standing does not imply that others without injury may sue as well. *See, e.g.*, *Hummel*

---

[3] Such factual challenges do not require a court to convert such motions to dismiss into motions for summary judgment. *See Apex Digital*, 572 F.3d at 443 (quoting *Evers*, 536 F.3d at 656–57).

*v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010 (7th Cir. 2016) (affirming the district court, 57 F. Supp. 3d 902 (N.D. Ind. 2014), which had dismissed individual plaintiffs who had not sufficiently shown or alleged injury). This is because "[t]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the *particular plaintiff* is entitled to an adjudication of the particular claims asserted." *Scanlan v. Eisenberg*, 669 F.3d 838, 846 (7th Cir. 2012) (quoting *Allen v. Wright*, 468 U.S. 737 (1984)) (emphasis added).

Regardless, none of these Plaintiffs has standing. Ms. Shiraef, Jane Doe 1, and Jane Doe 2 do not have standing as a factual matter, while Jane Doe 3 and Ms. Baker do not have standing on the face of their Complaint. *See* Compl. ¶ 7–12. For these reasons, the suit should be dismissed under Federal Rule of Civil Procedure 12(b)(1). To the extent that Plaintiffs allege additional generalized grievances, those allegations cannot support their standing either.

> A. <u>Plaintiffs Ms. Shiraef, Doe 1, and Doe 2 Do Not Have Standing as a Factual Matter, Because the University of Notre Dame Has Announced It Will Not Take the Exemption.</u>

Ms. Shiraef, Jane Doe 1, and Jane Doe 2 are students at the University of Notre Dame, which provides contraceptive coverage through the accommodation process via Aetna Student Health. *See* Compl. ¶¶ 7–9. Contrary to the assertion in Plaintiffs' complaint, the University has announced that it will not take advantage of the new exemption, but will continue to use the accommodation process. *See* Compl. ¶¶ 7–9; *cf.* "Notre Dame Employees and Students Recover Birth Control Coverage," University of Notre Dame Scholastic Magazine, (Nov. 9, 2017), https://scholastic.nd.edu/issues/notre-dame-employees-and-students-recover-birth-control-coverage, attached as Ex. A. Because the Complaint alleges that these Plaintiffs are injured "[a]s a result" of the University's decision, and because the University's actual decision was to provide students with coverage of all FDA-approved contraceptives through the accommodation process,

Plaintiffs have not, in fact, been injured.  *See* Compl. ¶¶ 7–9.

Any additional implied, theoretical fear that the University will, some day in the future, decide to take advantage of the exemption is simply speculation and insufficient to confer standing. *See Clapper*, 568 U.S. at 409 (injury must be certainly impending). Furthermore, if the University *did* decide to change its contraceptive benefits, it would have to provide its health plan members with either 30 or 60 days' notice before effecting the change.  *See* 82 Fed. Reg. at 47,813; *see also* "Notice by Issuer or Third Party Administrator for Employer/Plan Sponsor of Revocation of the Accommodation for Certain Preventive Services" (Nov. 30, 2017), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Notice-Issuer-Third-Party-Employer-Preventive.pdf.

### B. Plaintiffs Jane Doe 3 and Ms. Baker Do Not Have Standing on the Face of the Complaint.

Plaintiff Jane Doe 3 and Plaintiff Alicia Baker, on the other hand, have not sufficiently alleged that they are faced with a current or certainly impending injury.  Both Plaintiffs currently have contraceptive coverage.  *See* Compl. ¶ 10, 12.  The Complaint alleges that those plaintiffs "expect[]" that their employers and/or health insurance providers will take advantage of the new Rules.  *Id.*  But neither Doe 3 nor Ms. Baker have alleged facts to show that their employers or health insurance providers *will* make any changes to their health insurance coverage.  *See id.*  As mentioned, providers are required to provide health plan members with either 30 or 60 days' notice before effecting a change in coverage, which they are not alleged to have done.  *See* 82 Fed. Reg. at 47,813.  For these reasons, these plaintiffs have not established that they have a concrete, imminent injury sufficient for standing.  *See Lujan*, 504 U.S. at 560.

Jane Doe 3 works for a university in Illinois that objects to providing contraceptive coverage and that offers a health plan through the non-profit health care provider Christian

Brothers, which also objects to contraceptive coverage. Compl. ¶ 10. Nonetheless, Jane Doe 3 acknowledges that she is currently receiving contraceptive coverage, and she does not allege that her university or health plan have notified her of any changes to her coverage, now or in the future. *Id.* Jane Doe 3 alleges that her employer's third-party administrator, Christian Brothers, has opposed contraceptive coverage in litigation in the past, *id.*, but this allegation does not establish that anything about Jane Doe 3's health insurance will change as a result of the new rules, and she has made no such allegation. *Id.*

Ms. Baker is an employee of a church that does not oppose contraceptive coverage at all. Compl. ¶ 12. Her health insurance is offered by GuideStone Financial Resources, which does oppose the Mandate. *Id.* However, as mentioned in the Rules, GuideStone is a self-insured church plan that is exempt from ERISA altogether, and therefore not subject to the ACA mandate.[4] Even if it *were* subject to the mandate, however, GuideStone itself has announced that the rules "will have no impact on churches and participants seeking to re-enroll for 2018." *See* "GuideStone welcomes contraceptive mandate progress; Trump Administration rescinds Obama-era rule that led to Supreme Court case," GuideStone Financial Resources Press Release, (Oct. 6, 2017), attached as Ex. D. Therefore, Ms. Baker is not in imminent danger of losing coverage, and even

---

[4] *See* 82 Fed. Reg. at 47,823 ((Guidestone is a "self-insured church plan[]" and "Guidestone is a plan organized by the Southern Baptist convention."); *see also* GuideStone Financial Resources, "Self-Funded Church Plan FAQ",, https://www.guidestoneinsurance.org/HCR/GuideStoneHCR/Self-Funded/ChurchHealthPlanFAQ#550C7741CF474F87BE9427373D5750F7, attached as Ex. B (referencing "church plans, like those provided by GuideStone"); GuideStone Financial Resources, "What are GuideStone's eligibility requirements for Group Plans insurance coverage?", https://help.guidestone.org/30557-group-plan-employer/229398-what-are-guidestone-s-eligibility-requirements-for-insurance-coverage, attached as Ex. C (noting that to be eligible for GuideStone's "Group Plans insurance coverage" that "[t]he employer must be an eligible church, agency or institution affiliated with, or that shares common religious bonds with, the Southern Baptist Convention."). As the 2017 IFR recognizes, "the Departments lack authority to compel church plan TPAs to provide contraceptive coverage or levy fines against those TPAs for failing to provide it." 82 Fed. Reg. at 47,801. This is because church plans are exempt from ERISA unless they elect otherwise. Nonetheless, the TPA for a church plan may voluntarily provide contraceptive services; the government incentivizes these TPAs to provide the coverage by offering larger reimbursements. *See also* 80 Fed. Reg. at 41,323 n. 22; 45 C.F.R. § 156.50(d); 26 C.F.R. § 54.9815-2713AT(b)(6).

if she were to lose coverage, such loss would not be as a result of the new Rules.

Moreover, the fact that Ms. Baker has a sincerely held belief that married couples should be able to choose whether or not to use contraception is inapposite to her alleged injury. *See* Compl. ¶ 12. Although the Complaint alleges that "[t]he Rules establish and adopt one subset of religious views while denying health care to those with different views—including Alicia Baker," *id.* ¶ 78, the Complaint does not sufficiently support the allegation that the Rules will affect Ms. Baker at all. For these reasons, Ms. Baker has not alleged a certainly impending injury that would allow her to have standing before this Court.

The Seventh Circuit has repeatedly recognized that vague intimations about what might occur in the future are insufficient to support standing—indeed, "conjectural" threats of future injury are insufficient, unless accompanied by "continuing, present adverse effects" or "real and immediate future injury." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017). For example, in *Hummel v. St. Joseph County Board of Commissioners*, 817 F.3d 1010 (7th Cir. 2016), the Seventh Circuit found that certain disabled plaintiffs who were challenging accessibility for persons with disabilities at the St. Joseph County Courthouse did not have standing to challenge the accessibility of the juror facilities based only on the "mere prospect that they might someday be called to be jurors." *Id.* at 1021. Instead, the disabled plaintiffs could only challenge the features of the courthouse that directly affected them. *See id.* at 1020–21. In particular, the court also found that certain plaintiffs who were not blind could not challenge purported defects in the courthouse that would only affect those persons whose sight was impaired. Instead, the court reiterated that plaintiffs only had standing to sue based on courthouse facilities that posed real or immediate future injury to them. *See id.* at 1016.

Here too, Plaintiffs have not identified injuries that currently affect them, nor have they

identified some "real and immediate" future injury that would allow them to request declaratory and injunctive relief from this Court. *Id.* None of the Plaintiffs have alleged that they are currently unable to access contraceptive coverage without cost sharing, nor do they allege that they are imminently about to lose such access. To the extent that they do allege that they "expect" to lose access, the facts contradict these assertions. For these reasons, plaintiffs do not have standing.

### C. To the Extent That Plaintiffs Assert Generalized Grievances Based on Alleged Constitutional or Statutory Violations, Those Cannot Support Standing.

Plaintiffs seek to raise claims under the Administrative Procedure Act, Compl. ¶¶ 85–105; the Establishment Clause, *id.* ¶¶ 106–110; the Equal Protection and Due Process guarantees of the Fifth Amendment, *id.* ¶¶ 111–118; and the sex discrimination prohibitions of the Affordable Care Act, *id.* ¶¶ 119–122; as well as for declaratory relief, *id.* at 25. Plaintiffs assert, for each cause of action, that they are subject to "ongoing harm" or continuing injury. *Id.* ¶¶ 93, 105, 110, 118, 122. These conclusory statements, like the rest of the Complaint, fail to allege any actual injury.

Even reading these statements in the light most favorable to Plaintiffs, an implication that the Agencies' alleged violation of the Establishment Clause (or any other provision) injured Plaintiffs in the abstract must fail as a generalized grievance insufficient to support standing.

Injury-in-fact requires an injury that is "concrete and particularized," *Summers*, 555 U.S. at 493–94, and affects the plaintiff "in a personal and individual way," *Spokeo Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (citation omitted). A plaintiff cannot allege a "bare procedural violation" that is "divorced from any concrete harm." *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 887 (7th Cir. 2017) (citing *Spokeo*, 136 S. Ct. at 1549). In other words, a "generalized grievance," such as "every citizen's interest in proper application of the Constitution and laws," is insufficient. *Lujan*, 504 U.S. at 573, 575 (citation omitted); *cf. Baker v. Carr*, 369 U.S. 186, 204 (1962) (standing requires the plaintiff to "allege[] such a personal stake in the outcome of the controversy

as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions").

The fact that Ms. Baker has alleged that she holds a sincere religious belief that couples should be able to choose whether or not they use contraceptive coverage does not support any contention that the Rules injure her in particular, because the Rules do not affect her. *See* Compl. ¶ 12. For Ms. Baker, as for the other plaintiffs, the only plausible grievance remains a generalized one without an individualized injury. Plaintiffs cannot establish standing by arguing that they are part of a broad group of people who have been injured by witnessing an alleged violation of the Establishment clause, the Equal Protection guarantee, the APA, or any other provision purported to be at issue here. Plaintiffs therefore lack standing.

### 2. The Court Should Dismiss the Claims Because They Are Not Ripe.

In addition to the lack of standing, Plaintiffs' claims are also unripe. Ripeness is a doctrine of justiciability designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–149 (1967)). Ripeness encompasses both constitutional and prudential elements. *Id.* For the same reasons that Plaintiffs lack standing, their claim lacks constitutional ripeness, because the case does not present a true case or controversy for the purposes of Article III. *See Hinrichs v. Whitburn*, 975 F.2d 1329, 1333 (7th Cir. 1992) (citing *Wisconsin's Envtl. Decade, Inc. v. State Bar of Wis.*, 747 F.2d 407, 410 (7th Cir.1984)).

Even if this Court were to determine that the constitutional requirements are met, however,

the Court should dismiss Plaintiffs' claims as prudentially unripe. Under the doctrine of prudential ripeness, courts consider (1) "the fitness of the issues for judicial decision . . ." and (2) "the hardship to the parties of withholding court consideration." *Id.*

The issues in this case have not yet sharpened into the factual specificity that would aid review. Because no changes have been made to any of the insurance policies of Plaintiffs, the Court would be forced to guess what hypothetical changes *could* be made. For example, it is not clear on what grounds any of the employers—particularly Notre Dame, which has publicly announced it will not take advantage of the new exemptions, and Ms. Baker's employer, which does not object to providing contraceptive coverage—would base any decision to end such coverage, and whether that reason would actually qualify under the Rules. It is also speculative whether, like Notre Dame, the other employers will be satisfied with the optional accommodation process to maintain Plaintiffs' access to contraceptives without cost-sharing. The issues are thus not fit for judicial review.

As to the second element of the prudential hardship test, Plaintiffs will suffer no hardship if this Court does not immediately review their case, because their position has not changed. As discussed above, there is no evidence in the Complaint that any of these employers are about to change Plaintiffs' coverage; in fact, Notre Dame and GuideStone have specifically announced that they will *not* make any changes to the contraceptive coverage provisions of Plaintiffs' insurance. *See* Exs. A, D. Even if any such speculative change occurs, Plaintiffs will have at least 30 days' notice of any reduction in health insurance coverage, enabling them to seek review when and if any changes are announced. *See* 82 Fed. Reg. at 47,813. This is far from the "direct, immediate" harm that courts have found presents a hardship for the purposes of ripeness. *Bethlehem Steel Corp. v. U.S. Envtl. Prot. Agency*, 536 F.2d 156, 164 (7th Cir. 1976) (finding that interim

environmental rules that did not affect the day-to-day business of plaintiffs did not present a case ripe for review).

## **CONCLUSION**

For the reasons stated herein, this action should be dismissed.

Dated: January 5, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

ETHAN P. DAVIS
Deputy Assistant Attorney General

THOMAS L. KIRSCH II
United States Attorney

JOEL McELVAIN
Assistant Branch Director

*/s/ Christopher R. Healy*

CHRISTOPHER R. HEALY
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 514-8095
Facsimile: (202) 616-8470
E-mail: Christopher.Healy@usdoj.gov

*Counsel for Defendant*s